**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TIARA BURKS, *on behalf of* K.V., | ) | CASE NO. 5:25-CV-01444-JDA |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL |
| v. | ) | ARMSTRONG |
| | ) | |
| FRANK BISIGNANO, | ) | **MEMORANDUM OPINION** |
| COMMISSIONER OF SOCIAL | ) | **AND ORDER** |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## I.      INTRODUCTION

Plaintiff Tiara Burks ("Ms. Burks") seeks judicial review of the final decision of Defendant Frank Bisignano, the Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") on behalf of her minor son, K.V. (ECF No. 1). The Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties have consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (ECF No. 7). For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## II.      PROCEDURAL HISTORY

On January 19, 2023, Ms. Burks filed an application for SSI on behalf of K.V. (Tr. 251). The Social Security Administration ("SSA") denied Ms. Burks' application initially and upon reconsideration. (Tr. 137, 148). Ms. Burks requested a hearing before an administrative law judge ("ALJ"). (Tr. 169). On April 29, 2024, the ALJ held a telephonic hearing, at which

1

Ms. Burks was represented by counsel. (Tr. 52). Ms. Burks testified at the hearing. *Id*.

On June 10, 2024, the ALJ issued a written decision finding that K.V. was not disabled. (Tr. 8). The ALJ's decision became final on May 14, 2025, when the Appeals Council declined further review. (Tr. 1).

On July 10, 2025, Ms. Burks filed her Complaint, challenging the Commissioner's final decision. (ECF No. 1). Ms. Burks asserts the following assignments of error:

(1)     Whether the administrative law judge failed to properly evaluate the persuasiveness of Doctor Gunzler's opinion under 20 C.F.R. § 404.1520c.

(2)     Whether the administrative law judge failed to build a logical bridge between the evidence and his functional-domain findings, precluding meaningful review.

(ECF No. 9-1, PageID # 1078).

### III.     BACKGROUND

#### A.     <u>Personal, Educational, and Vocational Evidence</u>

K.V. was born in 2015. (Tr. 12). Under the Social Security regulations, K.V. was a school-age child on the date the application was filed and remained a school-age child at the time of the ALJ'S decision. *Id*. He has not engaged in substantial gainful activity since January 19, 2023, the application date. (*Id.*).

#### B.     <u>Relevant Hearing Testimony</u>

##### *1.     Ms. Burks' Testimony*

Ms. Burks testified that K.V. has a Section 504 plan that entitles him to bathroom breaks at school whenever he needs them in light of constipation issues. (Tr. 59). She testified that he is supposed to go to the bathroom twice per day during the school day and that he can take additional bathroom breaks as needed. (Tr. 60). She testified that K.V. is having fewer accidents at school, but that he continues to have accidents at home approximately three times per week. (Tr. 59-60).

2

She testified that he soils his underwear or has full bowel movements when he has an accident. (Tr. 60). Ms. Burks also testified that K.V. has Blount's Disease, which causes pain and issues with his tibia. (Tr. 66).

Ms. Burks testified that K.V.'s school performance is below average and that he received an individualized education plan ("IEP") on the day of the hearing because he has problems concentrating. (Tr. 61). She testified that the IEP is for all of his conditions, including his ADHD. (Tr. 62). She also testified that his ADHD causes him to wander around rather than focusing on his work. (Tr. 62-63). She further testified that K.V. has been working with a counselor for a year, but that she has not seen any changes in his behavior as a result of counseling because he will barely talk to the counselor. (Tr. 63). She also testified that K.V. does not sleep well but that his doctors do not want to put him on sleep medication due to the number of medications he is already taking. (Tr. 69).

Ms. Burks further testified that K.V. has been very angry over the past year and that he does not want to go to school. (Tr. 64). She also testified that he does not like taking his constipation medication very day. *Id*. She testified that K.V. cannot spend the night at a friend's house because he does not want his friends to know that he is on medication. (Tr. 67).

### C.     Relevant Medical/Non-Medical Opinion Evidence

#### 1.     *Julie Gunzler, M.D.*

On December 18, 2023, Dr. Gunzler, K.V.s pediatrician, wrote a letter stating that K.V. suffers from severe, lifelong constipation issues requiring specialist care. (Tr. 875). Dr. Gunzler also stated that K.V. had been hospitalized multiple times. *Id*. She further stated that K.V. has been diagnosed with Blount's disease, an orthopedic condition involving bowing of the legs with frequent leg pain and requiring regular orthopedic care.

On January 2, 2024, Dr. Gunzler completed a questionnaire regarding medical and

3

functional equivalence. (Tr. 876). Dr. Gunzler opined that K.V. had an extreme limitation in the domain of health and physical well-being. (Tr. 878). She also opined that K.V. had marked limitations in the domains of attending and completing tasks, interacting and relating with others, and caring for self. (Tr. 877-78). Dr. Gunzler further opined that K.V. had moderate limitations in the domains of acquiring and using information and moving about and manipulating objects. (Tr. 876-77). She opined that K.V. has problems with school attendance due to constipation and recurrent fever and that he needs help catching up with missed schoolwork. (Tr. 878). Dr. Gunzler also opined that K.V. experiences flare-ups of his leg pain and constipation every one to two months. *Id*.

The ALJ found that Dr. Gunzler's opinion was not persuasive because the limitations she identified were not supportive of or consistent with the longitudinal record, including educational records and physical exam findings. (Tr. 18). The ALJ also found that Dr. Gunzler's opinion was not persuasive because she used a checkbox form and did not cite to or provide any objective support for her opinions. *Id*.

### 2.    *Rebecca A. Hazen, Ph.D.*

On January 18, 2024, Dr. Hazen provided a letter stating that she had diagnosed K.V. with ADHD. (Tr. 890). Dr. Hazen opined that K.V. would likely benefit from further evaluation and additional intervention at school. *Id*. The ALJ found that he could not assign persuasiveness to Dr. Hazen's letter because she failed to opine on any specific limitations. (Tr. 18). However, the ALJ also stated that he considered Dr. Hazen's statements. *Id*.

### 3.    *Mary Alice Dombrowski, APRN*

On October 26, 2021, Nurse Dombrowski completed a "certificate to return to work/school," recommending that a 504 plan be put in place for K.V. in light of his chronic constipation. (Tr. 874). Nurse Dombrowski opined that K.V. should be permitted to use the

4

restroom as needed during class, that he be encouraged to defecate and urinate twice during the school day, that he have access to water and fluids at all times, and that he be allowed to change clothes and return to class with as little disruption as possible if he had difficulty controlling stool output. *Id*.

The ALJ found that Nurse Dombrowski's opinion was persuasive and that the limitations were generally supportive and consistent with the medical evidence. (Tr. 17). However, the ALJ also noted that Nurse Dombrowski provided her statement almost a year prior to the application date. *Id*.

### 4. *J. Joseph Konieczny, Ph.D.*

On August 23, 2023, Dr. Konieczny evaluated K.V. in connection with the disability claim. (Tr. 694). Dr. Konieczny opined that K.V. did not have any diagnoses and that he did not show any obvious limitations. (Tr. 695). The ALJ found that Dr. Konieczny's opinion was partially persuasive. (Tr. 18). The ALJ found that Dr. Konieczny's opinion was consistent with his examination but not entirely supportive of or consistent with the record as a whole, which showed slightly more restrictive limitations. *Id*.

### 5. *Kathryn Finn*

On December 15, 2023, Ms. Finn, K.V.'s second grade teacher, completed a school activities questionnaire. (Tr. 348). Ms. Finn noted that K.V. had accommodations that provided him with small group read-aloud tests and quizzes, a small group environment for state testing, and unlimited access to the restroom. *Id*. Ms. Finn opined that K.V.'s functioning was below average in attention span, following instructions, working independently, and understanding and completing assignments on time. *Id*. Ms. Finn also opined that K.V.'s functioning was well below average in learning reading, writing, and math. *Id*. Ms. Finn expressed concerns with K.V.'s learning, processing, use of the restroom, academic growth,

5

and lack of attention. (Tr. 349). However, she also stated that he had an average ability in getting along with peers and that he exhibited age-appropriate hygiene and self-care. *Id*.

### 6. *Stage Agency Medical Consultants*

On March 7, 2023, Dana Schultz, M.D., a state agency medical consultant, opined that K.V. had no limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself. (Tr. 133-34). Dr. Schultz further opined that K.V. had less than marked limitations in the domains of moving about and manipulating objects and health and physical well-being. (Tr. 134). On September 3, 2023 and September 15, 2023, Uma Gupta, M.D. and Jennifer Swain reviewed K.V.'s claim on reconsideration. (Tr. 144-45). The physical portion of the initial determination was affirmed. (Tr. 144). In light of K.V.'s new anxiety diagnosis, he was evaluated for psychological impairments, but no new impairments or limitations were identified. *Id*.

The ALJ found that the opinions of the state agency consultants were persuasive in part but that the identified limitations were not entirely consistent with the totality of the medical evidence. (Tr. 17). The ALJ found that slightly more restrictive limitations were warranted based on recent medical and educational records, resulting in a less than marked limitation in the domains of acquiring and using information, attending and completing tasks, and interacting with others. *Id*.

### D. **Relevant Medical Evidence**

#### 1. *Physical Impairments*

K.V. saw Nurse Dombrowski on October 25, 2022. (Tr. 476). She noted that he had diagnoses of chronic constipation, fecal soiling, and dyssynergic defecation. *Id*. Nurse Dombrowski worked with K.V. to use his belly muscles to push stool. *Id*. K.V. reported

changing his underwear a couple of times per day. (Tr. 477). K.V. also expressed a phobia around bowel movements. (Tr. 476). Nurse Dombrowski started him on Senna or milk of magnesia. (Tr. 476). She also noted that K.V. received a "potty watch" the previous year but was never able to get it to work. (Tr. 477).

K.V. saw Allison Gilmore, M.D. at University Hospitals on November 16, 2022. (Tr. 473). Dr. Gilmore noted that K.V. had been diagnosed with femoral anteversion of both lower extremities, internal tibial torsion of both lower extremities, and vitamin D deficiency. *Id*. She also noted that he had a history of constipation issues. *Id*. Dr. Gilmore stated that K.V.'s deformities were very mild, did not affect his activity level and performance, would not be expected to cause any pain or symptoms, and should resolve over time. *Id*. She also noted that his right leg pain had decreased and that his vitamin D levels had improved. *Id*.

On January 5, 2023, K.V. saw Nurse Dombrowski for follow-up on his chronic constipation issues. (Tr. 469). Ms. Burks reported that he continued to have accidents with both urine and stool but that it was difficult to know what was happening at school. (Tr. 470). During the visit, K.V. had a bowel movement without difficulty. (Tr. 469). His medications were continued, and Ms. Burks was instructed to give him constant reminders about using the bathroom at home. *Id*.

K.V. had another follow-up visit with Nurse Dombrowski on March 2, 2023. (Tr. 532). Nurse Dombrowski noted that getting K.V. on a strict bathroom schedule had been difficult and that he sometimes felt rushed by teachers. (Tr. 533). K.V. had not been able to get his potty watch working, and Nurse Dombrowski noted that it was not charged and was still in the packaging. *Id*. She also noted that K.V. was beginning to have fecal seepage two to three times per week, which was new. *Id*. Nurse Dombrowski further noted that K.V.

7

complained frequently of abdominal pain. *Id*. He was able to use the bathroom without difficulty during the visit. (Tr. 532). His medications were continued, and he was given a goal of one to two bowel movements per day without accidents. *Id*.

K.V. saw Nurse Dombrowski again on April 6, 2023. (Tr. 543). She noted that K.V. needed reminders to use the bathroom and that his issues using the bathroom had significantly impacted the family lifestyle. (Tr. 544). His urinary accidents had improved but his stool accidents had gotten worse. *Id*. During the visit, K.V. pushed out a small amount of stool, but Nurse Dombrowski believed he was still constipated. (Tr. 543). He was given a new potty watch to alert him twice per day. *Id*.

K.V. saw Dr. Gilmore again on May 17, 2023. (Tr. 573). Dr. Gilmore again stated that K.V. had very mild deformities that did not appear to affect his activity level and performance and that would not be expected to cause pain or symptoms. *Id*. Dr. Gilmore noted that K.V. did not appear to be in pain, but Ms. Burks reported that he intermittently complained of leg pain. (Tr. 574). On examination, K.V. displayed a mild amount of intoeing when walking, deformity from internal tibial torsion, mild genu valgum, slight knee hyperextension, femoral anteversion, and mild ligament laxity. (Tr. 575). Dr. Gilmore noted that K.V. was extremely active running down the hallway, could jump onto the examination table, and could jump up and down multiple times and sprint without pain. *Id*. On July 19, 2023, Dr. Gilmore restarted K.V. on vitamin D after he complained of right foot pain. (Tr. 688). She noted that x-rays and an MRI of his tibia did not show serious abnormalities. *Id*.

K.V. had another follow-up visit with Nurse Dombrowski on June 1, 2023. (Tr. 568). Ms. Burks reported that K.V. continued to have soiling issues but thought that they might have improved a bit. (Tr. 569). Nurse Dombrowski noted that K.V. was able to pass a large

amount of stool. (Tr. 569). His medication was adjusted. *Id*.

On June 5, 2023, K.V. saw Ali Khalili, M.D. for a follow-up gastroenterology appointment. (Tr. 563). It was noted that K.V. had previously had a normal anorectal manometry, rectal biopsy, and EGD. *Id*. Ms. Burks reported that K.V. was doing well and that prior withholding episodes had been resolved. (Tr. 564). Ms. Burks also reported that K.V. was experiencing infrequent fecal incontinence. *Id*. A physical examination was normal. (Tr. 564-65).

K.V. saw Nurse Dombrowski again on July 6, 2023. (Tr. 626). Nurse Dombrowski stated that K.V. was doing well and rarely had stooling accidents, though he occasionally had issues with urine leakage. (Tr. 627). At an August 10, 2023 well child examination with Dr. Gunzler, Ms. Burks reported that K.V. was not sleeping well and was still experiencing encopresis. (Tr. 697). His development was appropriate for his age. (Tr. 698). An August 28, 2023 abdominal x-ray showed a non-obstructive bowel gas pattern and a moderate amount of retained fecal matter. (Tr. 646).

K.V. saw Nurse Dombrowski again on October 18, 2023. (Tr. 788). Ms. Burks reported that it was more difficult to know whether K.V. was using the bathroom now that school was back in session. *Id*. She also reported that he was displaying more anger and resistance. *Id*. She said that K.V. would have occasional streaks in his underwear but that it was not common. *Id*. He continued to have some daytime accidents and lost the potty watch. *Id*. K.V. reported that he was tired of his constipation issues and of seeing doctors. *Id*.

At a December 7, 2023 follow-up visit, Nurse Dombrowski noted that K.V.'s condition had improved. (Tr. 896). He had not had a urinary accident in over two weeks but had experienced a few stooling accidents. *Id*. Ms. Burks stated that she felt his Linzess

medication was "too much." *Id*. She also reported that he was going to the bathroom four to five times per day at school, which she believed was too many. *Id*. K.V. reported a few episodes of abdominal pain at school. *Id*. On examination, he was positive for constipation and enuresis. *Id*. Nurse Dombrowski concluded that K.V. may be taking too much medication and adjusted his medication. (Tr. 901). She informed Ms. Burks that she did not need to see K.V. again if he continued to do well. *Id*.

On January 29, 2024, Ms. Burks reported to Dr. Khalili that K.V. had stopped taking Senna in December and that he had also fully stopped taking MiraLAX. (Tr. 981-82). His Linzess prescription was reduced. (Tr. 983).

### 2. *Mental Health Impairments*

K.V. was referred to Dr. Hazen in January 2023 for toileting difficulties. (Tr. 548). She noted that K.V. had a 504 Plan at school and was allowed to use the bathroom whenever he needed to, but that he was worried about what others would think. *Id*. He also worried about going back to the hospital due to his constipation issues. *Id*. Dr. Hazen noted that K.V. played soccer, basketball, baseball, did karate, and had friends. *Id*. She also noted that K.V.'s family history was significant for learning difficulties, depression, ADHD, and speech delays. *Id*. Dr. Hazen diagnosed K.V. with anxiety. *Id*.

At a follow-up visit on February 2, 2023, K.V. was somewhat hesitant to talk. (Tr. 551). He said that he was worried about asking to go to the bathroom at school because his teacher would tell him to hurry up. *Id*. K.V. was again hesitant to talk on February 9, 2023. (Tr. 555). He complained of stomach pain and began crying. *Id*. He did not want to discuss toileting. *Id*.

On April 6, 2023, K.V. presented to Dr. Hazen with an euthymic mood. (Tr. 561). Dr. Hazen noted that K.V. continued to have difficulty using the toilet. *Id*. He was no longer

10

worried about his teacher being mad, but did not want to use the bathrooms at school because they were dirty. *Id*. Dr. Hazen added encopresis to his diagnoses. (Tr. 560).

On June 1, 2023, K.V. was distracted and needed redirection to stay on topic. (Tr. 727). Ms. Burks reported that K.V. was doing well with the 10:00 a.m. bathroom reminder but that the 2:00 p.m. reminder was not working. *Id*. K.V. continued to show progress at his next several sessions, though he also showed increased anger at an October 5, 2023 visit. (Tr. 740, 748, 1024).

K.V. saw Dr. Hazen again on December 7, 2023. (Tr. 1025). He was distracted and needed redirection, and Ms. Burks indicated that he was having trouble with attention at school. *Id*. Dr. Hazen said that it would be helpful to have K.V. evaluated, which Ms. Burks agreed with. *Id*. Ms. Burks reported that K.V. had been doing well not wetting his underwear but had some soiling. *Id*.

On January 18, 2024, K.V. presented with an euthymic mood and needed to be redirected during the visit. (Tr. 1027). He was doing better using the bathroom at school and his wetting and soiling issues had declined. *Id*. Dr. Hazen informed Ms. Burks that K.V. met the criteria for ADHD and gave her documentation of the diagnosis. *Id*. On February 15, 2024, Ms. Burks reported that K.V. was doing well using the toilet. (Tr. 1028). On April 18, 2024, Ms. Burks that reported academic difficulties were impacting K.V.'s behavior. (Tr. 1039).

### E.    Educational Records

On October 26, 2022, K.V.'s Section 504 plan was renewed. (Tr. 862). The plan noted that K.V. had a diagnosis of chronic constipation, which could cause extended absences, missed instruction, and missed classroom material. (Tr. 863). Accommodations included use of the restroom as needed; encouragement to use the restroom at specific times; access to

11

water and fluids; and access to a change of clothing. *Id*. The 504 plan was continued in October 2023. (Tr. 325-27).

K.V.'s 504 plan was renewed again in February 2024. (Tr. 935). His accommodations for chronic constipation were continued. (Tr. 936). It was also noted that K.V. had a new diagnosis of ADHD, which could cause him to be inattentive and distracted in class. (Tr. 935-36). Additional accommodations were added, including repeated directions, chunking of assignments, opportunities for breaks, and extended time on certain tasks. (Tr. 937).

K.V. underwent individual evaluation on April 29, 2024. (Tr. 956). He tested in the "average" range for verbal abilities, nonverbal abilities, and IQ composite. (Tr. 957). However, when given the Kaufman Test of Educational Achievement, Third Edition, he tested as "below average" in various aspects of reading, math, and written language. (Tr. 957-58). One of K.V.'s teachers noted that he occasionally struggled with focus and following directions. (Tr. 960). An observer similarly noted that he struggled with staying on task. *Id*. Another teacher noted that K.V. needed adult support to complete an activity even though the activity covered a concept he had already been taught. *Id*.

The evaluator concluded that K.V. needed to build his phonemic skills, math computation, and number sense, and that he needed to add more detail and elaboration to his writing and use correct writing conventions. (Tr. 961). The evaluator also stated that K.V. needed accommodations such as small group testing, having tests or directions read out loud, extended time, physical breaks, chunking, frequent check-ins, prompting, preferential seating, and the use of math manipulatives. (Tr. 962). The evaluator further stated that K.V.'s academic progress needed to be monitored closely. *Id*.

K.V.'s academic records from the relevant period also show ongoing issues. His first

grade report card from May 30, 2023 indicated that K.V. rated as "needs improvement" in phonemic awareness, spelling, comprehending grade level material, writing, grammar, listening, completing work on time, remaining on task, subtracting from 10, measurements, telling time, and recognizing currency. (Tr. 295). Comments from his teacher indicate that K.V. needed to work on listening, following directions, staying on task, spelling, math, and taking assessments. (Tr. 296).

K.V.'s report card from the first quarter of second grade reflected similar issues. He was graded as "needs improvement" on reading and understanding vocabulary and material, using standard English conventions, spelling, and understanding numbers to one thousand. (Tr. 311). K.V.'s teacher noted that he struggled with math and reading and that he was receiving support three times per week to help his reading. (Tr. 312). Test results also reflect that K.V. was "well below benchmark" in decoding, letter sounds, reading accuracy, reading comprehension, reading fluency, word reading, and composite reading ability for 2023-24. (Tr. 321).

For the second and third quarters of second grade, K.V. was graded as "needs improvement" on understanding and applying vocabulary, recognizing level two words, using conventions of standard English, evidence, and elaboration, spelling, solving three-digit addition and subtraction problems, and telling time. (Tr. 931). Ms. Finn wrote that K.V. had made progress but that it had been very slow. (Tr. 932). She also wrote that K.V. got overwhelmed with work and shut down. *Id*. She stated that he worked much better in small group settings and that he had made improvement in his attitude toward work and in his effort level. *Id*.

On September 6, 2023, K.V. was put on a reading improvement and monitoring plan.

13

(Tr. 323). It was noted that he was "not on track" with respect to reading and that he rated in the fifth percentile on an initial screening test. *Id*. Under the improvement and monitoring plan, K.V. was to receive explicit intervention in phonemic awareness and decoding. *Id*.

On March 11, 2024, K.V.'s school district proposed to make an initial evaluation of him in light of his struggles with academic achievement. (Tr. 953). It was noted that Ms. Finn reported K.V. exhibited low initiation of tasks and limited retention of concepts. *Id*. Another teacher reported that K.V. had difficulty learning phonemic awareness skills. *Id*. In math, K.V. did not apply skills he was learning. *Id*.

On May 15, 2024, after the hearing date, an IEP was put in place for K.V. (Tr. 383). The IEP noted that K.V. continued to struggle with phonological skills, which impacted his ability to read and spell. (Tr. 386). The IEP also noted that K.V. struggled with math facts and number sense. *Id*. Under the IEP, K.V. was to receive specialized instruction in reading, writing, and math, along with accommodations such as small group testing, extended time, breaks, chunking, frequent check-ins, and preferential seating. (Tr. 404-06). Goals included increasing K.V.'s reading speed and accuracy, producing more complex written expression, improvement in solving story problems in math, and solving two-to-three-digit addition and subtraction problems. (Tr. 393-403).

## IV.      THE ALJ'S DECISION

The ALJ first determined that K.V. was a school-age child on January 19, 2023, the application date, and remained a school-age child on the date of the decision. (Tr. 12). The ALJ next determined that K.V. had not engaged in substantial gainful activity since the application date. *Id*.

The ALJ further determined that K.V. had the following severe impairments: chronic constipation, femoral anteversion, attention deficit hyperactivity disorder (ADHD), and

14

learning disorder. *Id*. The ALJ determined, however, that K.V. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. *Id*. The ALJ also determined that K.V. did not have an impairment or combination of impairments that functionally equaled the severity of any listing. (Tr. 13). In reaching that determination, the ALJ determined that K.V. had no limitation in moving about and manipulating objects and less than a marked limitation in the remaining functional categories. (Tr. 14). As a result, the ALJ determined that K.V. was not disabled. (Tr. 19).

## V.       LAW AND ANALYSIS

### A.  <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at \*2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (en banc)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); see also 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quotation omitted). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—such relevant evidence as a reasonable mind might

15

accept as adequate to support a conclusion." *Id*. (quotation omitted).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B.      Standard for Disability

To qualify for SSI benefits, "[a]n individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). To qualify, a child recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

Social Security regulations prescribe a three-step sequential process to evaluate children's disability claims. 20 C.F.R. § 416.924(a). At step one, a child must not be engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). At step two, a child must suffer from

16

a "severe impairment." 20 C.F.R. § 416.924(c). At step three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals, or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1. 20 C.F.R. § 416.924(d).

To make the step three determination that a child "meets" a listing, the child's impairment must be substantiated by medical findings shown or described in the listing for that impairment. 20 C.F.R. § 416.925(d). Alternately, to make a step three determination that a child "medically equals" a listing, the child's impairment must be substantiated by medical findings at least equal in severity and duration to those shown or described in the listing for that impairment. 20 C.F.R. § 416.926(a). Finally, to make a step three determination that a child "functionally equals" a listing, the impairment must be found to be "of listing-level severity," meaning that it will "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a).

The relevant six domains of functioning to be considered are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for herself/himself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). Those domains "are broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1).

A "marked limitation" "interferes seriously with [the child-claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). A child claimant's "day-to-day functioning may be seriously limited when [their] impairment(s) limits only one activity or when the interactive and cumulative effects of [their] impairment(s)

17

limit several activities." 20 C.F.R. § 416.926a(e)(2)(i). "'Marked' limitation also means a limitation that is 'more than moderate' but 'less than extreme.' It is the equivalent of the functioning [that the Commissioner] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(i).

An "extreme limitation" "interferes very seriously with [the child-claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). This may be so even though their "impairment(s) limits only one activity or when the interactive and cumulative effects of [the child-claimant's] impairment(s) limit several activities." *Id*. "'Extreme' limitation also means a limitation that is 'more than marked.'" *Id*. An extreme-limitation rating is the most severe, and it is reserved for "the worst limitations." *Id*. But it "does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning [that the Commissioner] would expect to find on standardized testing with scores that are at least three standard deviations below the mean." *Id*.

The Commissioner considers the child's functional limitations resulting from all of his impairments, including their interactive and cumulative effect. *See* 20 C.F.R. § 416.926a(e)(1)(i). The Commissioner "will consider all the relevant information in [the child claimant's] case record that helps [the Commissioner] determine [the child-claimant's] functioning, including [their] signs, symptoms, and laboratory findings, the descriptions [the Commissioner] ha[s] about [the child-claimant's] functioning from [their] parents, teachers, and other people who know [the child-claimant], and the relevant factors explained in §§ 416.924a, 416.924b, and 416.929." 20 C.F.R. § 416.926a(e)(1)(i). The child-claimant has the burden of proving that they are disabled. 20 C.F.R. § 416.912(a).

### C.      Analysis

Ms. Burks asserts two assignments of error, arguing that: (1) the ALJ did not properly evaluate Dr. Gunzler's opinion; and (2) the ALJ failed to build a logical bridge between the evidence and his findings that K.V. had a less than marked limitation in each functional domain. For the reasons set forth below, Ms. Burks' arguments are not well taken.

### 1.      *The ALJ's Evaluation of Dr. Gunzler's Opinion*

Because Ms. Burks filed K.V.'s disability claim after March 27, 2017, the "treating physician" rule, pursuant to which an ALJ was required to give controlling weight to an opinion from a treating physician absent good reason not to, does not apply. *See* 20 C.F.R. § 416.927; *Merrell v. Comm'r of Soc. Sec.*, 1:20-cv-769, 2021 WL 1222667, at *6 (N.D. Ohio Mar. 16, 2021), *report and recommendation adopted*, 2021 WL 1214809 (N.D. Ohio Mar. 31, 2021). Instead, the current regulations stated that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 416.920c(a).

The SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 416.920c(c). Section 416.920c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 416.920c(b)(1). Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. §

19

416.920c(b)(2). The ALJ "may" but is "not required to" explain how the ALJ considered the remaining factors. *Id*.

The "supportability" factor looks to how well the medical source supports the opinion with objective medical evidence from the record. *See* 20 C.F.R. § 416.920c(c)(1). "In other words, the supportability analysis focuses on the physicians' explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (quoting *Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)). The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. *See* 20 C.F.R. § 416.920c(c)(2). "As long as the ALJ discussed the supportability and consistency of the opinion and supported [the ALJ's] conclusions with substantial evidence within his decision, the Court will not disturb [the ALJ's] decision." *Njegovan v. Comm'r of Soc. Sec. Admin.*, No. 5:21-CV-00002-CEH, 2022 WL 1521910, at *4 (N.D. Ohio May 13, 2022).

As noted above, Dr. Gunzler opined that K.V. had an extreme limitation in the domain of health and physical well-being and marked limitations in the domains of attending and completing tasks, interacting and relating with others, and caring for self. (Tr. 877-78). The ALJ found that Dr. Gunzler's opinion was not persuasive for two reasons: (1) Dr. Gunzler provided her opinion on a checkbox form without elaboration; and (2) the limitations Dr. Gunzler opined on were not supportive of or consistent with the record. Substantial evidence supports the ALJ on both findings. (Tr. 18).

With respect to the checkbox nature of Dr. Gunzler's opinion, the Sixth Circuit has held that a checkbox opinion without explanation is "patently deficient." *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 475 (6th Cir. 2016) (holding that checkbox opinions

20

are "'weak evidence at best' and meet[] [the Sixth Circuit's] patently deficient standard'") (citation omitted); *see also Hamm v. Comm'r of Soc. Sec.*, 1:25-cv-00423, 2025 WL 3687383, at *6 (N.D. Ohio Dec. 19, 2025) ("Checkbox forms are 'the kind of vague and unhelpful opinion that is patently deficient and could not have been credited by the Commissioner.'") (quoting *Dollinger v. Comm'r of Soc. Sec.*, No. 22-3359, 2023 WL 1777386, at *4 (6th Cir. Feb. 6, 2023) (cleaned up)).

Ms. Burks argues that Dr. Gunzler's opinion was not a checkbox opinion because she provided written responses to questions at the end of the form. However, those brief written responses dealt only with whether K.V. had problems with school attendance, needed accommodations, or had an episodic condition. (Tr. 878). Dr. Gunzler did not provide any explanation with respect to her conclusions on the various functional domains. And while Ms. Burks notes that Dr. Gunzler provided a supporting letter along with her opinion, that letter was two sentences long and said only that K.V. suffered from lifelong constipation requiring specialist care and hospitalization, and that he had been diagnosed with Blount's disease, which caused frequent leg pain and required regular orthopedic care. (Tr. 875).

Regardless, as this Court and other courts in this district have held, a medical opinion may constitute a patently deficient checkbox form even where the medical source provides limited additional commentary. *See, e.g., Pica Ortiz v. Comm'r of Soc. Sec.*, No. 1:23-CV-00879-JG, 2024 WL 1660131, at *8 (N.D. Ohio Mar. 13, 2024), *report and recommendation adopted*, 2024 WL 1655786 (N.D. Ohio Apr. 17, 2024) (holding that "limited explanations" offered by medical source did not "convert the checkbox form-nature" of medical source's opinion) (citing cases); *Woodard v. Comm'r of Soc. Sec.*, No. 5:22-cv-01728, 2023 WL 5842016, at *3 (N.D. Ohio Sept. 11, 2023) (holding that opinion constituted check-box

21

opinion because description of diagnosis and symptoms were cursory and generic and medical source "did not elaborate on why the diagnosis and symptoms supported her checked-off opinion"); *Kreilach v. Comm'r of Soc. Sec.*, 621 F.Supp.3d 836, 848 (N.D. Ohio 2022) (finding that medical source's questionnaires were checkbox forms where the medical sources "checked boxes and wrote cursory statements about the supporting clinical findings and [p]laintiff's prognosis"). The ALJ properly discounted Dr. Gunzler's opinion because she provided it on a checkbox form.

The ALJ also did not err in his treatment of the supportability and consistency factors. Ms. Burks argues that the ALJ failed to "meaningfully discuss" how Dr. Gunzler's longitudinal findings were inconsistent with the record. (ECF No. 9-1, PageID # 1093). It is true that the ALJ did not provide a detailed analysis in the portion of his decision addressing Dr. Gunzler's opinion. However, a reviewing court reads an ALJ's decision as a whole. *See Taylor v. Kijakazi*, No. 1:20-cv-01121, 2021 WL 4477865, at *8 (N.D. Ohio Sept. 30, 2021). Before analyzing Dr. Gunzler's opinion, the ALJ spent two pages discussing K.V.'s treatment history with respect to constipation and ADHD, as well as his educational records. (Tr. 15-17), In that discussion, the ALJ acknowledged evidence that K.V. had ongoing constipation issues and that he was struggling academically. *Id*. The ALJ also cited evidence, however, that K.V.'s constipation and enuresis issues had improved somewhat. (Tr. 15-16). The ALJ also noted that, while K.V. had ongoing academic difficulties, IQ tests were in the average range, he had not repeated any grades, and he had no physical limitations that would impact his performance at school. (Tr. 15-17).

Ms. Burks cites to evidence in the record that she believes was consistent with Dr. Gunzler's opinion, including K.V.'s 504 plans, chronic constipation, phobia around bowel

movements, and failure to meet expectations in reading, writing, and math. However, the ALJ acknowledged all of that evidence in his decision, and a reviewing court may not "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)). Rather, as the Sixth Circuit has held, "the Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Substantial evidence supports the ALJ's conclusions here, and Ms. Burks' first assignment of error is without merit.

### 2.      *The ALJ's Functional Domain Analysis*

In her second assignment of error, Ms. Burks argues that the ALJ failed to build a logical bridge between the evidence of record and his conclusions with respect to the functional domains. In particular, Ms. Burks argues that the ALJ did not provide "reasoning or citations" explaining how the ALJ reached his conclusions and that the ALJ did not link the evidence and his ultimate findings for each domain. (ECF No. 9-1, PageID # 1093). She also argues that substantial evidence supports a finding that K.V. had at least a marked limitation in the domains of attending and completing tasks, caring for self, health and physical well-being, and acquiring and using information.

As an initial matter, Ms. Burks' argument misapprehends the applicable standard of review. The question is not whether substantial evidence would support a finding that K.V. had marked or greater limitations in certain functional categories. The question is whether substantial evidence supports the ALJ's contrary findings. The Court cannot overturn the Commissioner's decision merely because Ms. Burks has identified evidence that would have

23

supported a different result. *See Jones*, 336 F.3d at 477.

Ms. Burks is also incorrect when she argues that the ALJ failed to discuss evidence that could cut against his findings. She argues that the ALJ ignored K.V.'s Kaufman test results and his poor report cards. But the ALJ explicitly noted that K.V. tested at a below average level on reading comprehension, word recognition fluency, nonsense word decoding, math computation, math concepts and applications, spelling, and writing expression. (Tr. 17). The ALJ further noted that K.V. showed little growth despite intensive interventions and that he struggled with academic achievement, including difficulty in learning phonemic awareness and limited retention of concepts. *Id*.

Ms. Burks is correct that the ALJ could have been more explicit in linking his discussion of the evidence to his conclusions with respect to the functional domains. However, "the regulations do not require the ALJ to issue a perfect decision." *Merrell*, 2021 WL 1222667, at *6. Reading the decision as a whole, *Taylor*, 2021 WL 4477865, at *8, the ALJ provided sufficient analysis of the evidence of record for the Court to trace his reasoning. Substantial evidence supports the ALJ's conclusions, and the Court cannot overturn the Commissioner's decision even if substantial evidence may have supported a contrary result.

Finally, to the extent Ms. Burks is accusing the ALJ of cherry-picking the record for evidence that supported his conclusion, her argument is not well-taken. "[C]laims that the ALJ 'cherry-picked' the record are 'seldom successful' because they essentially amount to a request that the court 're-weigh record evidence,' which [a court] may not do." *Chicora v. Comm'r of Soc. Sec.*, 852 F. App'x 968, 971 (6th Cir. 2021) (quoting *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014)); *see also White*, 572 F.3d at 284 (noting that accusations of cherry picking "can be described more neutrally as weighing the evidence").

25

Ms. Burks' second assignment of error is without merit, and the Commissioner's final decision is affirmed.

## VI. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.


Dated: May 1, 2026

*/s Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge